*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GORDON/ROBINSON/COHOON, Minors.

UNPUBLISHED
March 14, 2024

No. 366125; 366175
Bay Circuit Court
Family Division
LC No. 21-013176-NA

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order terminating her parental rights to the minor children, JG, TG, ZG, HR, and SC, under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (likelihood of harm if returned to parent). We affirm.

## I. FACTUAL BACKGROUND

This case arises out of a petition for temporary custody filed by the Department of Health and Human Services (DHHS). In the petition, DHHS stated:

> [Mother] gave birth to [SC] on 3/23/21. [SC] was positive for Amphetamines and methamphetamines. [SC] was born at 32 weeks and is in the NICU. [Mother] has four other children in her care, [JG], [TG], [ZG], and [HR]. Forensic interviews were completed with [ZG] and [TG] and they disclosed that they get locked in their rooms and had to climb out the window to go to the bathroom. [TG] further disclosed that he saw [SC's father] tie [JG] to the bed and she had to eat through the rope to break free. [ZG] reports that [SC's father] hurts him by spanking him and has left bruises on him. He further stated that [SC's father] hurt his ankle because he snuck out of the home. [ZG] and [TG] are currently at their [m]aternal grandfathers [sic] home. The [m]aternal grandfather sexually abused [mother] when she was a child.

DHHS asked the court to take temporary jurisdiction over the children. A preliminary hearing was held the following day. The children had been temporarily removed from mother's care pending a court ruling on the petition. Mother waived a finding of probable cause at the hearing, and the

-1-

court authorized the petition. The trial court heard suggestions for relative placements for the children, but determined that it would be best for them to be placed in foster care at that time. At a later pretrial hearing, the referee noted that DHHS had sent documentation to relatives regarding placement and that home studies would need to be completed. In the meantime, the three older children and the two younger children had been placed in separate foster homes because there were no placements available with room to house all five children.

A two-day adjudication hearing was held on July 28, 2021, and August 2, 2021. Mother pleaded no contest to the jurisdictional grounds alleged in the petition. A case service plan (CSP) was put in place, and mother was ordered to attend parenting time, participate in substance abuse treatment, mental health treatment, parenting classes, and find stable employment and housing.

A series of dispositional review hearings took place between August 2021 and August 2022. At an August 2021 hearing, a foster care case manager testified that mother was not consistently attending parenting time visits. When she did attend visits, her behavior was mostly appropriate, although the case manager indicated that sometimes mother did not want to hold HR or comfort her. The case manager indicated that she was working with mother to help her manage the children's needs. DHHS was also working with mother to get her engaged with substance abuse and mental health treatment. Regarding relative placement, another foster care case manager indicated that she was performing background checks on relatives who had been suggested as potential placements for the children. Both workers recommended that the children remain in their current placements and that mother continue to follow her CSP.

Two months later, at a November 2021 review hearing, a foster care worker testified that the children were doing well in their foster care placements, had been going to school regularly, and were attending therapy. The foster care worker noted that mother had not complied with her CSP. She continued to test positive for methamphetamines, had not obtained a psychological evaluation, and had missed at least 50% of her parenting time visits. Barriers to reunification remained, including "substance abuse, parenting skills, emotional stability, housing, employment, [and] domestic relations[.]" The trial court continued its prior orders regarding mother's CSP and indicated that reunification remained the goal.

At a review and permanency planning hearing held on February 18, 2022, a foster care worker indicated that all of the children were thriving in their foster placements. Mother continued to fail to meet the terms of the CSP. Mother's attendance at parenting time visits was inconsistent. Her substance abuse issues were not under control and she admitted to using drugs, but stated that she wanted to be sober. Mother was not consistently engaged in any mental health treatment and remained unemployed. She also indicated that she wanted to co-parent with one of the children's fathers who had been violent toward her in the past. Nevertheless, the children's foster care worker continued to support the goal of reunifying mother with the children, provided that she made quick progress toward adhering to the CSP.

Dispositional review hearings were again held in May and August 2022. Mother continued to test positive for methamphetamines, and while she had completed a psychological evaluation, she had not enrolled in mental health treatment. By the time the August 2022 hearing was held, relations between mother and the children during parenting time had completely deteriorated; the children began crying during visits, and Children's Protective Services (CPS) workers believed

that continuing the visits would be harmful to the children. Termination of mother's parental rights was recommended.

A supplemental petition for termination of mother's parental rights was filed on November 1, 2022, stating that statutory grounds supporting termination existed under MCL 712a.19b(3)(c)(*i*), (*ii*), (g), and (j). Mother's parenting time visits were subsequently suspended at a review hearing held on November 8, 2022, as the visits were becoming increasingly harmful for the children. Trial on the petition began January 26, 2023. Testimony from various foster care and CPS workers indicated that mother had not complied with her CSP, tested positive for methamphetamines nearly the entire time that the children were in foster care, and could not manage five children at once during parenting time, despite having a bond with them.

Relevant to this appeal, a foster care case manager indicated that the children's maternal grandmother, who had recently moved from Michigan to Georgia, had expressed interest in fostering the children prior to the filing of the termination petition. CPS had not completed an investigation into whether her home would be an appropriate placement because she lived in Georgia. At the time, the supplemental petition for termination had not yet been filed, and reunification between mother and the children was the goal. It was DHHS's opinion that placing the children with relatives out-of-state would not be conducive to meeting that goal.

On the second day of trial, mother testified that she believed a guardianship with the children's grandmother would be appropriate as long as the children's grandparents continued living in Georgia, where they were staying with mother's sister. Mother conceded that both of her parents had struggled with substance use issues as recently as 2021, but stated that they were doing better in Georgia. She denied stating that her father, who would also be living on the Georgia property, had sexually abused her as a child, although the initial petition in this case stated otherwise. A case manager again testified that it was DHHS's policy not to consider out-of-state placements until after the parents' rights had been terminated, in order to prevent moving the children back and forth unnecessarily. She also testified that guardianship in Georgia was not considered with any seriousness because at one point, mother told her that she did not want the children to go live with their grandmother in Georgia.

The children's maternal grandmother testified on the third day of the trial, stating that she was willing to have the children come live with her in Georgia. At that time, she and her husband lived with mother's sister in a mobile home on a parcel of land with several properties on it. She explained that she had asked to foster the children in March 2022, after the children had already been placed in foster care for approximately a year, but said that DHHS never followed up with her regarding her request. Regarding the viability of long-term guardianship, another foster care worker explained that such guardianships were not recommend in cases where the children would remain in contact with a parent who continued to be inconsistent and unstable. DHHS's opinion was that there was no viable option for guardianship in this case because mother was not a stable presence in the children's lives.

On May 1, 2023, the court issued its final opinion. The court found that DHHS made reasonable efforts toward reunification prior to filing the supplemental petition for termination. The court found that mother made no progress managing her substance abuse or mental health issues, had failed to maintain stable employment and appropriate housing, had missed 97 of 218

parenting time visits, and had shown up late for 24 additional visits. The court thus found that statutory grounds for termination of mother's parental rights existed under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

The court acknowledged that mother had requested that the children be placed under guardianship with her parents, who were living in Georgia, and that her parents were willing to enter into a guardianship until mother could achieve reunification with the children. The trial court declined to place the children under guardianship, noting that the children had already been in foster care for 550 days since the filing of the original petition, with no apparent improvement in the conditions that led to adjudication. The court further explained:

> Mother and grandmother both testified that they would be, that grandmother or grandparents would be suitable and willing to take the children until such time, mom, mother could overcome her barriers.
>
> At the removal of the children mother was asked if there were any suitable relatives to take care, to take her children into care and mother did not provide any names. Mother went even further than that. When asked about her parents she stated she did not want her children to go to her parents because they were substance abuse users. When asked about this at the termination trial mother stated since they moved to Georgia they no longer use substances. She felt that as long as her parents lived in Georgia and on her sister's property that the children would be safe.
>
> The Court does not believe that this alternative would achieve proper care and custody. The statute is very clear when requesting placement with a relative it needs to be done in a certain time period at the beginning of the case and not at the tail end of a case when it's clear mother cannot overcome her barriers.

The court reasoned that placing the children under guardianship in the circumstances presented would not afford them the stability and permanency they deserved. The court found that termination of mother's parental rights was in each child's best interests. This appeal followed.

## II. ANALYSIS

Mother argues that the trial court erred by declining to place the children in a guardianship with her parents in Georgia. We disagree.

There is no dispute that statutory grounds for termination were established in this case. Once a statutory ground for termination has been established by clear and convincing evidence, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of

parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When evaluating whether termination is in a child's best interests, "[t]he trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (citation omitted). Factors to be considered in making the determination include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. (quotation marks and citation omitted). The trial court may also consider the child's wellbeing while in care and the possibility of adoption. *Id*. at 714 (citation omitted). At the best-interests stage, the court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App at 87. A trial court must consider each child's best interests. *In re Olive/Metts*, 297 Mich App at 42. However, a trial court need not, make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *In re White*, 303 Mich App at 715-716.

Initially, mother notes that DHHS had a "responsibility to expend reasonable efforts to provide services to secure reunification," *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012), including a duty to investigate potential relative placements for the children, prior to the filing of the supplemental petition for termination of parental rights. See MCL 722.954a. She faults DHHS for failing to investigate whether it would have been appropriate to place the children in foster care with her parents in Georgia while the proceedings were ongoing. In general, under MCL 722.954a(2),

(2) Upon removal, as part of a child's initial case service plan . . . the supervising agency must, within 30 days, identify, locate, notify, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional, and physical needs. Preference shall be given to an adult related to the child within the fifth degree by blood, marriage, or adoption provided the relative meets all relevant state child protection standards. *The department may make an exception to this preference only if good cause is shown*. As used in this section, "good cause" means any of the following:

(a) A request by 1 or both of the child's parents to deviate from this preference.

(b) The child's request, if the child is of sufficient age and capacity to understand the decision that is being made.

(c) The presence of a sibling attachment that can be maintained through a particular placement.

(d) The child's physical, mental, or emotional needs, such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live.

(e) The distance between the child's home and the proposed family placement would frustrate the reunification goal or otherwise impede permanency. [Emphasis added; see also the *Children's Foster Care Manual*, FOM 722-03, pp 2-

4 (discussing standard procedures for evaluating and placing children with relatives).]

While a relative placement should ordinarily be considered and prioritized over placement in foster care, DHHS showed good cause for declining to do so here. First, mother indicated that she would prefer the children *not* be placed with her parents in Georgia because her parents also struggled with substance abuse issues as recently as 2021. Additionally, at a review and permanency planning hearing, a CPS worker explained that DHHS considered the option of placing the children with mother's parents, but decided against it because it would be difficult for the children to maintain a bond with their mother if they were moved out of state. Moreover, the record indicates that the children had already been in foster care for approximately a year before their grandmother sought to have them placed with her in Georgia, and were doing well in their placements. Under the circumstances, it would have been detrimental to the children to uproot them from their foster placements and send them out-of-state to live with a relative. Thus, good cause for declining to place the children with relatives existed under MCL 722.954a(2)(a) and (e).

Mother also argues that the trial court should have placed the children under guardianship instead of terminating her parental rights. Generally, "guardianships are one of a few options available to a court when it determines that termination of parental rights is *not* in the best interests of the minor child." *In re Prepodnik*, 337 Mich App 238, 243; 975 NW2d 66 (2021). Put differently, "the appointment of a guardian is only appropriate after the court has made a finding that the child cannot be safely returned to the home, yet initiating termination of parental rights is clearly not in the child's best interests." *In re TK*, 306 Mich App at 707. Guardianships are largely only appropriate where "an ongoing relationship with [the parent]—rather than termination—is in the children's best interests." *In re Mason*, 486 Mich 142, 169; 782 NW2d 747 (2010). Here, the prospect of placing the children under guardianship was not raised until after the supplemental petition to terminate mother's parental rights was filed, and the trial court ultimately found that termination was in the children's best interests. This was so because the court believed that mother's continued substance abuse, housing and economic instability, and inability to adequately parent the children would continuously harm them. The court thus concluded that the stability and security of a permanent adoptive placement with the children's respective foster families would be more appropriate than continuing mother's unstable relationship with the children.

We agree with the trial court's assessment. Mother has made no significant progress toward reunification. The record shows that she made little to no progress to address her substance abuse and mental health issues, her poor domestic relationships, or her ability to maintain a stable job and housing over the course of the 500-plus days that the children were in foster care.[1] Had she demonstrated a willingness to fix these issues and provide a stable and loving home for the children at any point in the proceedings, perhaps a guardianship would have been an appropriate alternative to termination. But as it stands, allowing mother's relationship with the children to continue would likely only lead to more emotional and mental distress for them. The children deserve stability and permanency, which mother has simply not shown she can provide in a

---

[1] Notably, this was the children's second time in foster care, so mother was familiar with the expectations that the court and her CSP placed upon her.

reasonable amount of time, given the ages of these children.  Accordingly, the trial court did not err by finding that terminating mother's parental rights was in the children's best interests, and that a guardianship would not have been appropriate here.

Affirmed.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney